## Case No. 12,809.

### SHORT v. SKIPWITH.

[1 Brock. 103.] 1

Circuit Court, D. Virginia. Nov. Term, 1806.

PRINCIPAL AND AGENT—DISOBEDIENCE TO INSTRUC-TIONS—DAMAGES — MEASURE—USURY—COMMISSIONS.

1. Where an agent voluntarily disobeys the instructions of his principal, and converts to his own use a sum of money belonging to his prin-cipal, to which a definite and a specific destina-tion is given by the principal, and the article into which the agent is directed to convert the money subsequently acquires great additional value, the agent is not merely responsible for the money, so misapplied, with legal interest, but is accountable for the article into which it ought to have been converted.

2. Although it is a rule, that the condition of him who seeks to avoid a loss, is viewed with more favour than that of a person who seeks a gain; yet, between contending parties, the wrong-doer is the person who ought to suffer, and he shall not be allowed the benefit of the rule.

3. A, the principal, residing in Europe, directs his agent B, in Virginia, by letter bearing date December 20th, 1787, to convert the funds in his hands belonging to the principal, into certifi-cates, which B fails to do. In the spring of 1789, B determines to relinquish his agency, and places A's funds in the hands of C, except £51 16s. 10d., which are not accounted for. C in-vests the funds of A in certificates, according to his previous directions: Held, that B is charge-able with certificates which he ought to have purchased, with the balance remaining in his hands, at the same rate that other certificates were purchased by C, in 1789. But B is ac-countable for the certificates with their legal interest, only, and not with the certificates in-to which the interest might annually have been converted.

[Cited in brief in Enders v. Board of Public Works, 1 Grat. 386.]

4. The general policy of the law forbids that a debtor should be subjected to all the loss conse-quent on his failure to fulfil a promise to pay the debt. Such breaches are so often the result of events which could neither have been pre-vented or foreseen by the debtor, that interest is generally considered as compensation, which must content the creditor.

[Cited in Polsley v. Anderson, 7 W. Va. 212; Baker v. Rinehard, 11 W. Va. 245.]

5. A contract of loan for six per centum inter-est, when the law allowed only five, is clearly usurious; but where the person who betrays the lender into such a contract is his agent, it would be against good conscience that the borrower should derive any advantage to him-

---

1 [Reported by John W. Brockenbrough, Esq.]

self, prejudicial to the lender from this circumstance, and the lender is entitled to legal interest.

6. An agent, who, in his character of agent, collects a debt due to his principal, and retains it by contract of loan with his principal as debtor, entered into before the debt is collected, is not entitled to commissions on the amount so collected.

The complainant, William Short, a citizen of the state of New York, filed his bill in this court, in 1803, against the defendant, setting forth that Skipwith, as agent of the plaintiff, had abused the confidence reposed in him by his principal, had failed to account for several sums of money received by him in his character of agent, and had neglected to apply other funds of Short, which had come to his hands, according to the positive instructions of Short; whereby he had sustained heavy losses, and praying an account, &c. By the letters of Short to Skipwith, which are filed in the cause, it appears that Short, in January, 1786 (then residing in France), constituted the defendant his agent in Virginia, and directed him to withdraw certain military certificates belonging to Short, from the hands of Benjamin Harrison, Jr., his former agent in Virginia; and to remit the interest which had accrued or should thereafter accrue thereon to the said Short, in Paris. The plaintiff, however, on the 4th of May, 1787, informed his agent that he was no longer in need of the interest arising from the certificates, and desired him to convert it into principal, that he preferred to have it converted into certificates, but gave his agent no positive instructions to that effect. On the 4th of August of the same year, Skipwith acknowledged the receipt of Short's letter of the 4th of May preceding, in which he strongly dissuaded Short from making any further investment in certificates, stating, that "he had already ventured far enough on the faith of a Virginia assembly." He urged Short, however, to give him positive instructions, promising that they should be obeyed. These positive instructions were given by the plaintiff in his letters of the 20th and 31st of December, 1787, of the 1st of February, 1788, and of the 20th of March, 1788. These letters are couched in very strong terms, and urge Skipwith, in the most earnest manner, to convert all of Short's funds which should come to his hands from any source, into certificates. These instructions were not complied with, and in the spring of 1789, the defendant relinquished his agency, and placed the certificates belonging to Short, with the interest which had accrued on them, except £51. 16s. 10d., in the hands of James Brown, a merchant residing in Richmond, Virginia, who proceeded to convert the interest. viz., £290. 10s. 7d., into certificates. It was not invested, however, as advantageously as it might have been at the corresponding period of the previous year, when the instructions from Short to Skipwith were received, they having risen in value considerably. The plaintiff asserts a claim to the difference, and contends that the deficiency of £50. 16s. 10d. should be considered as certificates according to their value in 1788. As to the other questions in the cause, the circumstances out of which they arose are sufficiently stated in the following opinion of the court.

MARSHALL, Circuit Justice. In arguing this cause, the counsel, both for the plaintiff and the defendant, rely upon the situation of the parties as furnishing strong reasons in favour of that result for which they severally contend. The plaintiff, in a distant country, commits his most important interests to his friend in Virginia; places in the hands of that friend large sums of money, which are to be employed for the advantage of the owner, manifests a strong preference for their being invested in the public funds, and, after some time, expressly orders that investment. The agency is entered into with alacrity; but the agent was a private gentleman, not in habits of dealing in public paper, and residing at some distance from the great market to which the commodity was most usually brought. It certainly was not to be expected, that a person under the circumstances of the defendant, could execute the orders of the plaintiff with the celerity and adroitness of a professed dealer in certificates; but it was to be expected, that the orders of the plaintiff would not be disobeyed, and his remote situation increased the obligation not altogether to neglect any part of his business. In its origin, the duty of the agent, except as it regarded the collection of a few debts, which will form an object of particular consideration, was limited to the safe custody of the certificates of his principal, and a remittance of the interest. The circumstances of the plaintiff, probably, changing so as no longer to require remittances from Virginia, he formed the resolution of converting the profits of his estate into additional capital, which resolution was communicated to the defendant in a letter of the 4th of May, 1787. This letter manifests a preference for certificates over other property, but unquestionably submits it to the discretion of the agent who was on the spot, to act according to the opinion he should form on circumstances which were often changing. Nothing can be more obvious than that the judgment of the agent was in direct opposition to that of his principal, and that he was radically opposed to those hazardous investments to which his principal was strongly inclined. Under these impressions, he earnestly dissuades the plaintiff from the measure to which he seemed most inclined, but accompanies his request for positive orders, with explicit assurances that those orders, whatever they might be, should be obeyed. This request produced the letter of the 20th of December, which could not be well misunderstood. Only strong circumstances, unknown to the plaintiff when that letter was written, and rendering it al-

most certain that the public debt would not be placed on solid funds, could have justified a departure from the instructions contained in the postscript of that letter. Seldom is less latitude given to an intelligent, an upright, and a distant agent. The letters of the 31st of the same month, and of the 1st of February, 1788, are still more positive. The suspicion, that any state of things could exist which might render the observance of these orders imprudent, seems to have passed away, and they are absolute. The defendant could not misunderstand them. In the spring of 1789, the defendant became disposed to relinquish the active part of his agency; and, thereupon, he placed the fund in the hands of Mr. James Brown. The whole interest which had accrued on the certificates was not at this time accounted for. It appears from the report, that £51. 16s. 10d. were neither invested in certificates, nor placed in the hands of Mr. Brown, nor accounted for in any manner. The court knows not what disposition was made of this money, and must consider it as having been appropriated by the defendant to his own use. If any other application was made of it, it is incumbent on the defendant to show such application. Whether this residuum was in specie, or in warrants, is not expressly stated; but a view of the report would induce the opinion, that it was a balance of interest money accruing before the 1st of January, 1789; and, consequently, must be considered as specie. If the fact be otherwise, the defendant ought to show it. Had this money been placed in the hands of Mr. Brown, it might have been, and would have been, so far as any facts can authorise such a conclusion, converted into certificates. The question, then, arising upon this part of the case is, whether an agent who voluntarily disobeys the orders of his principal, and converts to his own use a sum of money belonging to his principal, and distinctly appropriated to a definite object, shall be accountable for the money and interest, or for the article into which it ought to have been converted?

The situation of the defendant has no bearing on this case, because, if he found a difficulty in making personally the necessary investment of money in certificates, he could have found no difficulty in delivering the money, with the certificates and interest-warrants, to Mr. Brown. The case appears to be stripped of every circumstance which can give to it any other character than that of a diversion of funds by a trustee from their proper object to his own use. That the principal has been essentially injured in the events which have happened by this breach of trust, that the restoration of his money with interest will be no compensation for this injury, is too obvious to be controverted; that the agent will sustain great real loss if decreed to compensate the principal, is, perhaps, equally true.

On the part of the defendant, it is urged with great force, that the condition of him who seeks to avoid a loss, is viewed with more favour than that of a person who seeks a gain. The influence of this argument will always be felt by those, whose duty it becomes to decide questions of this description; and if other considerations be nearly balanced, its influence must be decisive. But there may exist considerations which ought to overcome the mild policy of the rule which has been stated. It is also a maxim, which, on every principle of morals, is entitled to great regard, that between contending parties, the wrong doer is the person who ought to suffer. In the present controversy, no blame can attach to the plaintiff. His instructions are distinct, the means of observing them are placed in the hands of Mr. Skipwith, and it cannot be alleged that the failure to observe them is, in the most remote degree, to be ascribed to Mr. Short. That the balance, whatever it may be, rests with Mr. Skipwith, seems incontestable. If, because the loss of Mr. Short is merely the loss of gain, his compensation should be restricted to the restoration of his money with interest, the encouragement which such a decision would give to dangerous and corrupt practices in the intercourse between a principal and his agent, must be apparent. It would hold forth an inducement, in every instance where extraordinary profit might be made, to divert trust funds into other channels than those for which they were designed, to the great injury of a large portion of society. It is said, and truly said, that extravagant calculations of conjectural profits are not to be indulged, and will never be regarded in courts of justice, as the standard by which damages are to be ascertained. The example given is, that the plaintiff might have subscribed his stock to the bank, might have sold out at a high price, and employed the produce of the sales advantageously. Certainly, such possibilities are to be totally disregarded. But, undoubtedly, where a single investment of money is ordered on a specific article, which article of itself, without any new operation depending on the judgment, acquires great additional value, this additional value cannot fairly be denominated the result of an extravagant calculation of imaginary profits. Suppose a contract for the purchase of an increasing property of any description, which contract depended on the payment of money on a given day. If the agent in whose hands the purchase money was placed, should, instead of executing his trust, convert a part of the money to his own use, and thereby defeat the contract, it would seem unjust that the remedy of his principal should be limited to the money and interest. That this would not necessarily be the measure of damages, is to be inferred from the circumstance, that the injured person is not confined to an action for money had and received to his use, but may maintain a special action on the case for the damages actually sustained. Be-

tween the case supposed, and that at bar, there seems to exist no solid distinction. The difference between a contract actually made, and one which the agent had engaged to make, and possessed the absolute power of making, seems not sufficient to warrant a different decision in the case of a misappropriation of the fund.

Reasoning by analogy, there are many principles settled by decisions, which justify the position, that in general cases, the agent who voluntarily commits a breach of trust, by applying the trust money to his own use, must account for the loss which his principal has sustained. But by each party an authority has been cited, which is considered as applying directly to the case before the court. On the part of the defendant, the case of Groves v. Graves, 1 Wash. [Va.] 1, has been relied on, as a direct authority, for limiting the recovery of the plaintiff in this case, to his principal and interest. In the case of Groves v. Graves [supra] the principle that the value of the article, when the contract ought to be performed, is the proper standard of damages, was not laid down as a general rule to govern in ordinary cases, but is stated to be the proper rule under the peculiar circumstances of that case. What those peculiar circumstances were, must be searched for in the record, as the opinion of the court makes no allusion to them. That there were circumstances to which the court allowed weight, ought to be inferred, from their resting their decision, not on general principles, but on those peculiar circumstances. If we examine the case, as reported in 1 Wash. 1, we find no other testimony than the contract, and a deed of trust as a collateral security for the performance of that contract. The decree of the chancellor is founded on the contract being designed to secure an unconscionable advantage, or on its being obtained from a person whom Groves had reason to believe a needy man. But the opinion of the court of appeals disclaims this ground, as the lowest price of certificates mentioned in the contract was merely a penalty, and as the price actually agreed on was only the lowest market price. The contract, therefore, did not exhibit those peculiar circumstances on which the opinion of the court was founded, and certainly, the collateral security could not change the nature of the rights which the contract gave. In fact, that case has since been generally considered, notwithstanding the terms in which the opinion of the court was delivered, as settling a general principle, which should apply to all contracts made in public paper. Yet there are in the case, some particular circumstances, which, whether sufficient to be the motives for the decree or not, were most probably of some weight. Although the lowest price mentioned in the contract is, in construction of law, a penalty, yet it was intended by Mr. Groves, to avail himself of that penalty. he obtained a judgment at law for it. and his answer claimed the whole ad-

vantage of that judgment. Even the actual price agreed upon was the lowest market price. Graves, against whom the judgment was obtained, was not himself the wrong doer, did not himself receive the money, but was the security of Stockdell. It is not impossible that these circumstances might have some weight in producing the opinion which was given. None of them exist in the case now under consideration.

The plaintiffs have cited a case from 2 East, 211 (Shepherd v. Johnson), in which it was decided in the court of king's bench, that in a contract for replacing stock, the price on the day was not the true measure of damages, but the subsequent rise ought to be taken into consideration. The only peculiarity attending that case is, that it appears to be a loan of stock, and not a contract for its purchase. Between a loan and a contract to purchase at a fair price. where the money is actually advanced by the purchaser, and no casualty prevents the seller from procuring the article, the court cannot distinctly perceive a difference. An agent misapplying the fund to his own use, does not appear in a more favourable point of view than a borrower. The case in 2 East, 211, therefore, appears to be directly in point, and in this case, the court is of opinion, that the defendant is accountable in certificates for the money remaining in his hands. Perhaps, in strictness, that money ought to be converted into certificates, at the price taken by the commissioner.[2] But the disposition to diminish so excessive a loss, as the defendant would sustain by this rigid application of the rule, will induce the court to lay hold of any principle or fact, which the case affords, to effect this diminution. If the money in the hands of Mr. Skipwith had been placed in the hands of Mr. Brown, in the spring of 1789, although this would have been a tardy execution of the trust. it would have satisfied the court. Had the money been placed in Mr. Brown's hands, it is not clear that it would have been invested in paper to more advantage, than the money which was placed in his hands. Upon this part of the case, then, it is the opinion of the court, that the money remain-

---

[2] The commissioner in his report, estimates the certificates at the price which they bore in the spring of 1788. In 1789, they had risen very much in value. The opinion here intimated by the chief justice, that the money in the hands of the agent should be considered in strictness, as certificates, at the price they bore in 1788, would seem, by analogy. to be the correct one. As between the vendor and vendee of property deliverable on a certain day, in futuro, it is well settled by a series of decisions, that in a suit by the vendee for damages for the failure to deliver, the measure of damages is the value of the article at the time of the breach. The contract price on the one hand, and the rise subsequent to the breach, are both to be disregarded. See note 1 to Letcher v. Woodson [Case No. 8,280]. where the cases on this subject are collected. In would seem, that the principle of those cases would apply equally to the relation between principal and agent.

ing in Mr. Skipwith's hands, ought to be converted into certificates, at the same rate that other monies were converted into paper in the year 1789, it is presumed, by Mr. Brown. The same train of reasoning which rejects the admission of compound interest, will induce the court to direct, that these certificates shall be accounted for, with only their legal interest, and to set aside so much of the report, as charges the defendant with the certificates into which the interest might annually have been converted.

The next point to be considered, is the money placed in the hands of Col. Kennon, and invested by him in certificates. As this was a transaction of the defendant himself, it was his duty, either to have collected this debt, or to have transferred this claim to Mr. Brown, and have put it in his power to collect it. To have omitted to do either, is such excessive negligence as in a case, of the character of that before the court, cannot be tolerated. By holding up this claim, after the agency had passed into other hands, Mr. Skipwith must be considered as taking upon himself the responsibility for its amount, to Mr. Short. But, pursuing the principle which was observed in regard to the money applied to his own use, the court will consider him as accountable only for the certificates and interest.

The third exception to the report, respects the debt which was due from Col. Harvie. The transaction relative to Harvie's bond is, in some important particulars, distinguishable from those parts of the case which have been already noticed. This money does not appear to have been used by Skipwith, in virtue of the general agency, but in consequence of a loan. Previous to the letters of January and February, 1786, a communication concerning the lending and borrowing of that debt had taken place between William Short and the defendant. Although the nature of this communication does not appear to be accurately recollected by either of the parties, it is sufficiently apparent, that the defendant wished to borrow the money, and that the plaintiff was willing that he should receive it on loan. Although the letter of July 3d, 1786, shows, that Skipwith had relinquished any right to the money, which might be given by the conversation with Short, yet the proposition made to the plaintiff in that letter, has relation to the original contract, and seeks to renew it. It is true, that at the time of receiving the bond from Edmunds, the defendant did not take it upon himself. He seems at that time to have been equally apprehensive of paper money, and of the abolition of certificates, and not to have chosen to expose his friend to the one casualty, or himself to the other. It was only after the debt was collected, that he was willing to consider it as his own. His letter of March, 1787, announces his collection of the debt, and his determination to

hold it at six per cent. The plaintiff's letter of the 20th of December, 1787, manifests his satisfaction with this employment of the fund.

From a review of all the circumstances which preceded the completion of this transaction, it results, that the money was collected by the defendant, in his character as agent, and applied to his own use, in consequence of a contract to that effect, which was made before his agency commenced, which contract was sanctioned by the plaintiff in the letter of appointment, and which application was afterwards approved by him. Where, in different parts of the same transaction, the same person acts in different capacities, it is often difficult to assign to each part its distinct character. Indeed, it will often happen, that the two characters are so intermingled, that each will impart something of itself to the other. The question made in this case is, whether Skipwith held the money collected from Col. Harvie, as a common debtor, or as the agent of Mr. Short? So far as respects an ability to avail himself of any penalty, to which Mr. Short might be exposed, there can be no doubt, but that he ought to be subjected to all the restraints of an agent, or trustee.. But in other respects, his character seems to be rather that of an ordinary debtor. He appropriated the money to his own use, not merely in virtue of his authority as agent, but with the previous and subsequent approbation of the plaintiff, and he paid interest on the money so appropriated. It is true, that an express promise was made to hold the money, subject to the orders of the plaintiff, but the loan does not appear to have been made on this condition; and, in point of fact, every sum payable on demand is held on the same terms. Yet it is a question of some intricacy, whether this money is not to be considered as being in Mr. Skipwith's hands, as agent, and not as a debtor, in consequence of the letter of the plaintiff, directing its investment in certificates, and the promise of the defendant to comply with that direction, and whether Mr. Skipwith is not liable to the extent of his promise. With some hesitation, the court has decided this question in the negative. The original appropriation of this money to his own use, having been an act which was perfectly rightful, Mr. Skipwith has been already stated to have been so far an ordinary debtor, and it would be going a great way to subject a debtor, who promises to pay a debt, to all the loss consequent on his failure to fulfill his promise. The general policy of the law does not admit of such strictness; and although, in morals, a man may justly charge himself, as the cause of any loss, occasioned by the breach of his engagements, yet in the course of human affairs, such breaches are so often occasioned by events which were unforeseen, and could not easily be prevented, that interest is gen-

erally considered as compensation. which must content the injured. Mr. Skipwith, therefore, will be decreed to account for Harvie's debt in specie, and not in certificates.

There is another part of this claim, which the court touches with real reluctance. The contract of loan being for six per centum interest, when the legal interest was only five, was evidently usurious. The court cannot decree a larger interest than the law allows, whatever may be the contract of the parties. But the person who drew the plaintiff into this contract, having been himself the agent, it would be against conscience, that he should derive any advantage to the prejudice of the plaintiff from this circumstance. The court, therefore. allows the legal interest of five per centum. Had the court approved the conversion of this debt into certificates, the commission upon its collection, and upon its investment, would undoubtedly be approved also. But the change of this essential principle, produces corresponding changes in minor parts. which are connected with it. The defendant. having collected this money for himself. is not entitled' to a commission on the collection: and as he is not chargeable with certificates. he can have no claim to commissions on such investment. Another slight change to be made in the account is. in the allowance. of expenses, as well as commissions, on the business actually transacted. That reasonable expenses ought to be allowed, if commissions are withheld, is unquestionable, but when commissions are allowed. it is supposed to be usual to admit no other charge on the business.

The court has felt some difficulty. respecting Griffin's note. It is unquestionable, that the orders of Mr. Short did not authorise such a purchase, and that it was an indiscreet exercise of his powers as agent, to purchase the bond of any person for certificates, instead of the certificates themselves. This indiscretion is enhanced by taking an assignment. without recourse on the assignor. It is answered by the defendant. that Mr. Short was well satisfied with a similar contract, made with Mr. Giles. But upon examining the letter of Col. Skipwith. which announces this purchase, he states the acquisition to have been of certificates themselves, nor does he allude to the real state of the fact, until his letter of June 16th, 1788. In that letter, he gives some account of his investments, and states himself. to have paid Mr. Giles £30 for £200. in military notes. There are several reasons for not considering the non-appearance of a disapprobation of this proceeding, as an implied permission to deal in private bonds, instead of public securities. The expressions used are ambiguous, and might be misunderstood by Mr. Short. After a positive statement given by Skipwith, that he had actually purchased public

securities, the term military notes might well have been understood, by a person in Mr. Short's situation, as a species of public paper, not as a private note for public paper. The same letter, too, promises a detailed statement of the situation of the plaintiff's affairs. which was not given till 1791. long after this contract with Mr. Short was made. The letters of Mr. Short, subsequent to June, 1788, press continually for this statement, and urge an investment of all his funds. according to his explicit instructions, which were given in his letters of December. 1787, and February, 1788. Those letters certainly contain nothing which can mend the defendant's case. The circumstances of the contract, also. deserve consideration. It is remarkable, that Col. Skipwith purchased this note partly on credit. In March, 1788, when the note was purchased, he paid £29. 15s. 4d.. and in the December following. £120. 4s. 8d. The argument, that he purchased a bond. instead of certificates themselves, for the sake of the credit, is scarcely to be resisted. He ought not to have required credit. He would then have been in funds from the interest-warrants of the plaintiff, had he retained that fund for the object to which it was appropriated. What the opinion of the court, on this point, might have been, had this bond been purchased for ready money, need not be stated. It would certainly have presented the question, under an aspect less unfavorable to the defendant's cause; but, circumstanced as the case is, the court cannot admit this item to the defendant's credit. This opinion is not formed on the situation of the obligor. The testimony of the case, induces the opinion, that his ability to pay the debt might have been confided in. But the defendant ought not to have purchased any bond, and the probability that this improper measure was occasioned by having made use of the funds of the plaintiff, in his hands, seems decisive of his liability for this sum. But. as he has actually paid for the bond, and has not, in this respect, retained in his hands the money of the plaintiff, but has sought to invest it in certificates, there is a distinction between this part of the case, and that in which the court held the defendant responsible for the amount of the money retained, in certificates themselves. For this sum, therefore. the defendant will be chargeable only in specie.

For the reasons given in the report, the defendant is not chargeable with Randolph's bond. For the mare, the defendant is accountable. but the commissioner possessed no testimony, which would enable him to introduce that item into the account. Unless it can be arranged by the parties, it must be settled by a jury, and for that purpose, an issue will be directed.

Decree. This cause came on to be heard

at the last term on the bill, answer, depositions, exhibits, the report of the commissioner, the exceptions to that report, and the arguments of counsel, all which being fully considered, the court is of opinion, that the instructions given by the plaintiff to the defendant, in his letters of December, 1787, and February, 1788, to convert the money in his hands, into public securities of some description, were positive, and ought not to have been disregarded; and that, therefore, the defendant is accountable in certificates, at the rate at which they appear in the receipt of James Brown, which is one of the exhibits, to have been purchased in 1789; for so much money arising from the interest on the plaintiff's certificates, as was retained by the defendant, and applied to his own use; but that he is accountable only for simple interest on those certificates, at the rate of six per centum per annum. The court is also of opinion, that the defendant, having not only neglected to furnish the plaintiff, or the agent who succeeded to the management of his affairs, with any document which could enable him to recover the debt due from Richard Kennon, must be considered as having collected that debt, or as having made himself responsible for it, and is, therefore, chargeable with the sum in certificates, which the said Kennon stated himself to have purchased. The court is further of opinion, that the debt due from J. Harvie, in the proceedings mentioned, was placed in the hands of the defendant on loan, and is to be accounted for in specie, with interest, at the rate of five per centum per annum, that being the interest which, when the debt was contracted, it was lawful to receive; but the defendant is not entitled to the commissions, with which he is credited in the report for collecting this debt, he having received it on loan. The court is further of opinion, that the defendant was instructed to purchase public securities, and not empowered to buy private bonds for public securities, and, therefore, that he is not entitled to a credit in account for Griffin's bond, the more especially, as that bond was purchased on a credit at a time when the money of the plaintiff was in his hands. But as the sum given for this bond, appears to have been laid out, with the intention to benefit the plaintiff, and not for his own advantage, the defendant is only to be charged with the sum in specie, with interest thereon, at the rate of five per centum per annum. The court is further of opinion, that the credits given to the defendant, on account of expenses, ought to be disallowed, the commission on his transactions as agent being a sufficient compensation for those transactions.