### JUDD *v.* HARRINGTON.

(*Common Pleas of New York City and County, General Term.* June 6, 1892.)

**CONTRACTS IN RESTRAINT OF TRADE—CONTEMPORANEOUS AGREEMENTS.**

    An agreement between sheep brokers to enter into an association for the protection of their interests and to prevent competition, and to pay to the treasurer thereof a certain amount for each sheep sold by them, and to receive, each, an arbitrary proportion of the sum so accumulated, is against public policy and void, where it was made as a part of and in furtherance of an agreement between sheep butchers to form an association for like purposes, and an agreement between the two associations and the members thereof, whereby the brokers stipulated not to slaughter any sheep, and to sell none, except to members of the butchers' association, without paying for each one sold to others 15 cents, the butchers binding themselves to buy sheep from the members of the brokers' association only, and to forfeit the same amount for each one bought from others; and it is competent to show such auxiliary and contemporaneous agreements, although the action is one brought by the brokers' association to recover a penalty for the breach by one of its members of the first-named agreement.

Appeal from trial term.

Action by Sylvanus Judd, as treasurer of the New York & New Jersey Sheep Brokers' Association, against Dennis Harrington, to recover a penalty for the breach of the following agreement:

"Whereas, the undersigned members of the New York and New Jersey Sheep Brokers' Association, an unincorporated association, formed for the purpose of guarding and protecting their several interests, deem it for their mutual benefit that their business relations should continue to be closely allied, to the end that loss may not arise to their consignors nor to themselves by unreasonable competition in business and commissions, and that the interests of all parties may be protected and promoted hereby; and whereas, all the parties hereto have agreed to pool and make a common fund of all the commissions earned in the sale of all sheep and lambs excepting those agreed to be paid to the Sheep and Lamb Butchers' Mutual Benefit Association of the City of New York as long as this agreement remains in force, and have also agreed that all said commissions shall be divided among the parties hereto in the ratio or proportion hereinafter set forth: Now this agreement witnesseth that for and in consideration of one dollar, each to the other paid, and the mutual covenants and agreements herein contained, the parties hereto have agreed, and by these presents do severally and respectively, and each for himself and for his firm, hereby covenant and agree each with the other, as follows:

"*First.* That each and all the parties to this agreement, including all the firms of which either of the parties hereto now are or may at any time hereafter become a member, shall and will at all times hereafter, and as long as this agreement remains in force, keep just, true, and correct books of account, in which the number of all the sheep and lambs sold by him or them or their firm shall be entered regularly and in the order in which sales of sheep and lambs are made.

"*Second.* At the close of each and every week, or within two days thereafter, each and every party or firm hereto shall render a written statement, signed by him or them, to the treasurer of said association, showing the full number of all the sheep and lambs sold by him or them or their firm during said week.

"*Third.* Said treasurer shall regularly and weekly enter all such statements in books to be kept by him for future reference, and he shall also file away and preserve each and all such original statements so delivered to him by each and all of the parties or firms hereto.

"*Fourth.* At the close of each month a settlement shall be had, and said treasurer shall foot up the total amount of sales of sheep and lambs for that month, and the total number sold by each person or firm, parties to this agreement, and embody them in a statement of that month's business, and he shall, within two days thereafter, deliver to each party or firm a copy of said statement, and each and all the parties or firms to this agreement shall within three days after the receipt of the treasurer's statement, as aforesaid, pay to said treasurer eleven and three quarter ($11\frac{3}{4}$) cents per head for each and every sheep and lamb sold by him or them or his or their firm during said month, as shall appear by said treasurer's monthly statement. Said treasurer shall immediately, or as soon as all parties to this agreement have made their payments to him as herein provided, hand to each and all the parties and firms hereto his check as treasurer for the amount or percentage of all said commissions due and coming to him or them respectively, and so on from month to month: provided, however, that said treasurer may for convenience of business ascertain at the close of any month whether the percentage of sales made by any person or firm that month is greater or less than his or their proportion under this agreement of the total sales for that month at the rate of eleven and three quarter ($11\frac{3}{4}$) cents per head, and said treasurer may then demand from or pay to such party or firm such sum as will correctly adjust said percentage at the rate of eleven and three quarter ($11\frac{3}{4}$) cents per head, so that each party or firm shall receive monthly the percentage of the total commissions on all sales as herein provided.

"*Fifth.* The several parties and firms hereto shall be entitled to and shall receive the following percentage of all commissions earned as herein provided for and during this agreement, viz. :

| | | |
|---|---|---|
| Dillenbeck & Dewey, | Fourteen | per cent. |
| Hallenbeck & Davis, | Twelve | " |
| Hume & Mullen, | Seven and $\frac{3}{4}$ | " |
| Everett & Pidcock, | Seven. | " |
| D. Harrington, | Nine | " |
| Newton & Gillett, | Nine and $\frac{3}{4}$ | " |
| Judd & Buckingham, | Seven and $\frac{1}{2}$ | " |
| J. F. Sadler & Co., | Twelve and $\frac{1}{8}$ | " |
| Philip S. Kase, | Two and $\frac{1}{2}$ | " |
| Sherman & Culver, | Nine | " |
| J. N. Pidcock, | Nine and $\frac{3}{8}$ | " |

"*Sixth.* All moneys which the New York and New Jersey Sheep Brokers' Association shall receive from the Sheep and Lamb Butchers' Mutual Benefit Association of the City of New York shall be divided from time to time, at the close of every month, in the proportion above provided for the distribution of commissions among the parties hereto.

"*Seventh.* In case either of the parties or firms to this agreement shall die, go out of business, or cease to be members of the New York and New Jersey Sheep Brokers' Association, such fact shall not affect this agreement, but the percentage which such party or firm would have been entitled to receive out of the commissions shall be divided between the remaining parties hereto in the proportion above set forth.   But in case any firm shall be dissolved, and any one member only of said firm shall continue the business, then such member shall be entitled to receive the proportion his firm would have been entitled to.   And in case any firm should be dissolved, and more than one member of such firm shall continue the business, then all the members of said firm together so continuing the business shall be entitled to receive the same proportion or percentage of the commissions their firms would have been entitled to had no dissolution been made.

"*Eighth.* It is further agreed that this association shall have power, in case of the death of any member thereof, to admit to membership a suitable person to transact the business of such deceased member; such admission to be by a majority vote.

"*Ninth.* It is mutually covenanted and agreed that the liquidated damages which each party and firm shall be liable to and shall pay to the treasurer of the New York and New Jersey Sheep Brokers' Association as damages for the violation of this agreement shall be the sum of ten thousand dollars.   Any and all money recovered by said treasurer under this clause of this agreement shall, after deducting all costs and expenses and counsel fees paid or incurred by him in any suit to recover the same, be divided between the parties hereto in the same proportion as the commissions are divided, excluding therefrom, however, the party from whom such money may have been recovered.

"*Tenth.* This agreement shall take effect on the first day of January, eighteen hundred and eighty-seven, and shall continue in force for three years from and after said date.

"In witness whereof the parties hereto have hereunto set their hands this eleventh day of April, eighteen hundred and eighty-seven.

"Signed and delivered in presence of W. H. H. KASE.

| | |
|---|---|
| "DILLENBECK & DEWEY. | JUDD & BUCKINGHAM. |
| "HALLENBECK & DAVIS. | J. F. SADLER & CO. |
| "HUME & MULLEN. | PHILIP S. KASE. |
| "EVERETT & PIDCOCK. | SHERMAN & CULVER. |
| "DENNIS HARRINGTON. | JAMES N. PIDCOCK." |
| "NEWTON & GILLETT. | |

Defendant alleged that at the time of the execution of said agreement there existed a combination known as the "Sheep & Lamb Butchers' Mutual Benefit Association," consisting of nearly all the butchers of sheep and lambs in the cities of New York, Jersey City, Brooklyn, Long Island City, and that part of Hudson county, in the state of New Jersey, which is not included in Jersey City. That said association, and the members thereof, substantially do and control the butchering and preparing for market of all the sheep and lambs prepared for consumption in said cities and a considerable portion of the surrounding territory, and also for export from said cities to outlying places. That said last-mentioned association was formed under an arrangement between it and the members thereof and the New York & New Jersey Sheep Brokers' Association, or the members thereof, which latter association was also formed under such arrangement or scheme. That the object and purpose of such scheme and of the formation of said two associations was to control and enhance the price of all the sheep and lambs, and of the meat obtained therefrom, in the aforementioned cities and territory. That the agreement upon which the action was brought was entered into as a part of such scheme or arrangement; and that in furtherance of such scheme or arrangement the said two associations so formed entered into an agreement between themselves, of which the following is a copy:

"Articles of agreement made and entered into this 20th day of December, eighteen hundred and eighty-six, by and between [naming parties,] together comprising the unincorporated association known as ' The New York and New Jersey Sheep Brokers' Association,' and herein styled the parties of the first part, and [naming parties,] together comprising the unincorporated association known as ' The Sheep and Lamb Butchers' Mutual Benefit Association,' of the city of New York, and herein styled the parties of the second part: Witnesseth, whereas, the parties of the first part are engaged in business in or about New York market as wholesale brokers in sheep and lambs, and the parties of the second part are engaged or interested in the business of buying sheep and lambs for slaughter and sale in or about New York market; and whereas, it has been and is deemed beneficial and for the interest of all parties hereto that they should be more closely connected in business, and should render such mutual aid, protection, and assistance as is hereinafter set forth: Now this agreement witnesseth, that in consideration of one dollar, each to the other paid, and the mutual covenants and agreements herein set forth, the said parties of the first part hereby jointly, severally, and separately, and each for himself, individually and jointly, covenant and agree to and with the said parties of the second part as follows:

"*First.* That on and after this date they will each keep true and correct books of account, showing all the sheep and lambs by them or their firms respectively sold in or about or for New York market.

"*Second.* The parties of the first part jointly and severally agree each for himself to render to the secretary of said parties of the second part, at the close of each month while this agreement is in force, a just, true, and correct copy of the account in his or his firm's books, showing the full number of sheep and lambs sold by him or his firm in or about or for New York market for said month.

"*Third.* Said parties of the first part further, jointly, severally, and each for himself separately, covenants and agrees that at the time of rendering said account to said parties of the second part, that he or his firm will pay to the said parties of the second part three and one quarter ($3\frac{1}{4}$) cents per head for each and all the sheep and lambs sold by him or his firm, respectively, in or about or for New York market, composed of the city of New York, Hudson county, N. J., and Long Island City and Brooklyn, N. Y., for or during said month; said payments to be made on or before the fifth day of each and every month.

"*Fourth.* Said parties of the first part further covenant and agree not to slaughter, or to have any one for it or them or either of them slaughter, any sheep or lambs, or directly or indirectly be interested in slaughtering any sheep or lambs, except for purposes of export only. If at any time during the continuance of this agreement the parties of the first part, or any or either of them, shall slaughter, cause, or procure to be slaughtered, or be interested in the slaughtering of, any sheep or lambs for New York market, composed of New York city, Hudson county, N. J., and Long Island City and Brooklyn, N. Y., except for exportation, then, in that case, the agreement shall thereupon terminate as to the person or firm parties of the first part so slaughtering, causing, or procuring to be slaughtered any sheep or lambs.

"*Fifth.* Said parties of the first part further covenant and agree, jointly, severally, and each for himself separately, that he or his firm will not directly or indirectly sell any sheep or lambs to any persons or person, firm or firms, except to the parties of the second part, excepting T. C. Eastman and Joseph Eastman, for their personal trade in and for New York market, composed of the city of New York, Hudson county, N. J., and Long Island City and Brooklyn, N. Y., and for all sheep and lambs sold by any of the parties of the first part to any other persons except to the parties of the second part for New York market, composed of New York city, Hudson county, N. J., and Long Island City and Brooklyn, N. Y., and excepting T. C. Eastman and Joseph Eastman, as aforesaid, the said parties of the first part agree to pay to the treasurer of the said parties of the second part fifteen cents per head for each and every sheep and lamb so sold.

"*Sixth.* Said parties of the first part further agree to report to the president of the parties of the second part at the close of each and every week any and all sales made by any of its members to any person or firm other than the parties of the second part, and at the close of each month pay over to the treasurer of the parties of the second part the sum of fifteen cents per head for each and every sheep and lamb so sold. And in case any of the parties of the second part should learn of any such cases not reported by the parties of the first part, as aforesaid, then said parties of the second part shall give notice of the same to the president of said parties of the first part, and, if the facts shall be as claimed on examination, then said parties of the first part shall thereupon at the close of that week report and return said sale, and at the close of that month pay over to the parties of the second part the fifteen cents per head as above provided.

"Said parties of the second part covenant and agree with the several parties of the first part, severally and jointly, as follows:

"*First.* That they will at all times during this agreement keep the parties of the first part informed of the names of all parties who are members of their association, and will, as often as any changes occur, notify the parties of the first part of any changes in the members of their association. The said parties of the second part shall have the right to add at any and all times during the terms of this agreement one or more members to their said association, and the members so added shall thereupon be entitled as fully to all the rights and privileges and subject to all the liabilities as if they had been named in and subscribed this agreement. Said parties of the second part hereby further agree that said new members, while members of the association, shall abide and be governed by the covenants and agreements and perform the covenants and agreements herein.

"*Second.* Said parties of the second part further agree that each and every person or firm that now are or shall at any time hereafter become members of their association shall, so far as practicable, make all their purchases of sheep and lambs in or about or for New York market of and from one or the other of the parties of the first part or their firms, and shall purchase all sheep and lambs consigned to any of the parties of the first part; and in case

any one of the members of the association of the parties of the second part shall fail to make his or their purchases of or from some one of the parties of the first part or their firms, or of any of the parties of the first part, then, and in that case, said parties of the second part agree to pay to the treasurer of the association of the parties of the first part, for the benefit of all the parties of the first part, the sum of fifteen cents per head for each and every sheep or lamb purchased by any one or all of their members from any person, firm, or corporation whomsoever, other than the parties of the first part.

"*Third.* Said parties of the second part further agree to report to the president of the parties of the first part, at the close of each and every week, any and all purchases made by any of its members of or from any person or firm other than the parties of the first part, and at the close of each month pay over to the treasurer of the parties of the first part the sum of fifteen cents per head for each and every sheep and lamb so purchased. And in case any of the parties of the first part should learn of any such cases not reported by the parties of the second part, as aforesaid, then said parties of the first part shall give notice of the same to the president of the parties of the second part, and, if the facts shall be claimed on examination, then said parties of the second part shall thereupon at the close of that week report and return said purchase, and at the close of that month pay over to the said parties of the second part as above provided.

"*Fourth.* It is hereby mutually covenanted and agreed by the parties to these presents that the death, resignation, or expulsion of any of the parties herein shall not affect this agreement, but the surviving and remaining parties, without further agreement, action, or covenant, shall continue, and this agreement shall remain in full force as to the remainder.

"*Fifth.* This agreement shall commence and take effect on the first day of January, 1887, and continue until the first day of Jannary, 1890.

"In witness whereof the parties to these presents have hereunto set their hands and seals this 20th day of December, 1886." (Signatures.)

From a judgment for defendant, and order denying a new trial, plaintiff appeals. Affirmed.

Argued before DALY, C. J., and BISCHOFF and PRYOR, JJ.

*A. Prentice,* for appellant.   *Edw. C. Boardman,* for respondent.

PRYOR, J.   For answer to the action defendant alleges that the contract sued on is void, because made in pursuance and furtherance of a combination to prevent competition in the supply of sheep meat in the market of New York.' The real plaintiff is the New York & New Jersey Sheep Brokers' Association, suing in the name of its treasurer. On the 20th December, 1886, this association entered into an agreement with the Sheep & Lamb Butchers' Mutual Benefit Association, which, reciting that the parties of the first part are engaged in business as wholesale brokers in sheep and lambs, and the parties of the second part are engaged in the business of buying sheep and lambs for slaughter and sale, proceeds to stipulate, in substance, among other things, that the parties of the first part should not slaughter any sheep or lambs, except for export only, or sell any sheep or lambs, except to the parties of the second part,—which stipulation is secured by a penalty,—and that the parties of the second part should make all their purchases of sheep and lambs from the parties of the first part, which stipulation also is secured by a penalty. Seeing that the brokers who sell and the butchers who buy in combination control the supply of sheep meat, it is clear beyond question that the intent and effect of the agreement are to prevent competition with the brokers in selling and with the butchers in furnishing the meat to the market; and, such being the evident purpose and tendency of the agreement, the law adjudges it void without proof of its actual operation. "It is not necessary to inquire whether the effect of the agreement was in fact detrimental.

The true inquiry is, is it the natural tendency of such an agreement to injuriously influence the public interests? The rule is that agreements which in their necessary operation tend to restrain natural rivalry and competition, and thus result in disadvantage to the public, are against the principles of sound policy, and void." FOLGER, J., in *Atcheson* v. *Mallon*, 43 N. Y. 147. *Salt Co.* v. *Guthrie*, 35 Ohio St. 672; *Richardson* v. *Buhl*, (Mich.) 43 N. W. Rep. 1102; *Anderson* v. *Jett*, (Ky.) 12 S. W. Rep. 670; *Hilton* v. *Eckersley*, 6 El. & Bl. 47, 65; *Clancey* v. *Salt Co.*, 62 Barb. 406; *People* v. *Chicago Gas Co.*, (Ill. Sup.) 22 N. E. Rep. 798; *Hooker* v. *Vandewater*, 4 Denio, 349; *Stanton* v. *Allen*, 5 Denio, 434; *Wire Cloth Case*, special term, Feb. 1891,[1] affirmed at general term. If, then, the particular agreement on which the action proceeds was connected with and auxiliary to this unlawful combination between the brokers and butchers, it is necessarily infected with the vice of its principal, and is equally and alike invalid. That it was so connected, and so auxiliary, is clear to demonstration. The agreement between the brokers and butchers was made 20th December, 1886; the agreement sued on was made 11th April, 1887. The latter refers in terms to the former, and makes provision for the distribution of money to be received from the butchers' association pursuant to the combination contract. Indeed, it is impossible not to perceive that the organization of brokers effected by the agreement sued on was for the very purpose of carrying out the provisions and policy of the combination. It results, therefore, that whether the agreement sued on be not of itself and alone void, because suppressing competition,—to restrict competition is the object avowed in its preamble,—still, by reason of its implication and co-operation with the unlawful principle and provisions of the combination contract, it is poisoned with the same illegality, and is equally incapable of sustaining an action. But appellant objects that the agreement between the brokers and butchers is not lawfully in evidence, because "two legal rights"—the agreements under consideration—"cannot make one legal wrong," *i. e.*, produce the illegality of the contract in suit. The argument begs the question in assuming the validity of the brokers' and butchers' agreement, which, as already seen, is illegal and void. The invalidity of the contract in suit was pleaded in defense to the action; and it is always competent to show by proof *aliunde* that an apparently valid contract is vitiated by illegality. Nor does partial performance by a party of an illegal contract avail to estop him to assert its illegality at any stage of the controversy. The combination agreement, then, being properly in evidence, and established by uncontroverted proof, and its necessary effect being to invalidate the contract sued on, it was at once manifest that in no event could the action be maintained; and the learned trial judge might, without more, have dismissed the complaint. But he allowed the litigation to proceed, and left it to the jury to say whether the combination between the brokers and butchers was unlawful. The construction and legal effect of the contract in suit was, under the circumstances, the function of the court; and, had the verdict upheld the contract, the submission of the question to the jury would have been fatal error. But since by their finding they construed the contract correctly, the error in referring its validity to their decision is of no prejudice to the plaintiff. From the fact that the moment the agreement between the brokers and butchers was in the case the action was irretrievably lost to the plaintiff, it follows that no error, if any, in the admission or exclusion of evidence, is of effect upon the validity of the judgment. We are not satisfied, however, of any error in the rulings on evidence. Appellant objects to a certain class of evidence, because it was admissible only after a confederacy had been shown; but a conspiracy was conclusively established by the agreement between the brokers and butchers, and then everything said or done by the parties to the

---

[1] See note at end of opinion.

combination in furtherance of its design was competent evidence against the plaintiff. It was a favorite maxim with Chief Justice MARSHALL that the law regards with more favor him who would avoid a loss than him who would acquire a gain. *Short* v. *Skipwith*, 1 Brock. 103; *Blane* v. *Drummond*, Id. 62. If this action be sustained, the defendant, for a mere technical default, will suffer a forfeiture of $10,000. Our conclusion is that the judgment and order be affirmed, with costs. All concur.

NOTE.

The opinion at special term, filed February, 1891, is as follows:

"PRYOR, J. In extinguishment of an admitted cause of action the defendant pleads that an equivalent sum is due it from plaintiff in virtue of the following allegations of fact: That three incorporated companies and two copartnership firms, engaged in the manufacture and sale of wire cloth, entered into an agreement whereby, for the avowed object of 'regulating the price' of the commodity, they constituted themselves an association, imposed upon themselves stipulated rates of charge, engaged that they 'will sell no cloth at less than the prices set forth;' and to insure obedience to this undertaking subjected themselves to a heavy penalty for its violation; that plaintiff and defendant are parties to this agreement and association; that, pursuant to a provision of the agreement, defendant deposited $2,000 with the United States Trust Company, to be forfeited to the other members of the association in the event defendant should violate *inter alia* its obligation not to sell below the stipulated price; that the association declared the $2,000 forfeited, and that of this sum plaintiff received and wrongfully retains $500, which defendant counterclaims against its indebtedness to plaintiff. The validity of the counterclaim is challenged for formal defects, but as I am of opinion that the plea is bad in substance I dismiss from consideration the technical grounds of demurrer.

"The declared purpose of the agreement is to enable the association, as between its members, to 'regulate the price' of the commodity in which they deal, and this result is accomplished by empowering the association to fix a price, and by binding its members, under a penalty, not to sell below the sum so prescribed. Since all the members are to sell for the same price, of course competition between them is impossible; and, having power to fix the price, they will be impelled by the irresistible operation of self-interest to raise that price to the highest attainable figure. Here, then, is an agreement of which the inevitable effect is, in conformity with its proclaimed design, to restrict competition in trade, and to arbitrarily enhance the price of a commodity of commerce. That such a contract is repugnant to public policy, and so unlawful, is a settled principle in the jurisprudence of this country. The people have a right to the necessaries and conveniences of life at a price determined by the relation of supply and demand, and the law forbids any agreement or combination whereby that price is removed beyond the salutary influence of legitimate competition. 'With results naturally flowing from the law of supply and demand the courts have nothing to do; but when agreements are resorted to for the purpose of taking trade out of the realm of competition the courts cannot be successfully invoked, and their execution will be left to the volition of the parties thereto.' *Santa Clara* v. *Hayes*, 76 Cal. 387, 18 Pac. Rep. 391. 'In its very nature a right to exclude competition is injurious to the public.' *City* v. *Gas Co.*, 70 Mo. 69. 'Public policy favors competition in trade, to the end that its commodities may be afforded to the consumer as cheaply as possible.' *Salt Co.* v. *Guthrie*, 35 Ohio St. 666. 'Free competition is the life of business; and all combinations for the purpose of raising or controlling the prices of merchandise are monopolies, and intolerable, and ought to receive the condemnation of all courts.' *Richardson* v. *Buhl*, (Mich.) 43 N. W. Rep. 1102. 'The natural law of supply and demand is the best law of trade.' *State* v. *Goodwill*, 41 Alb. Law J. 53. 'Rivalry is the life of trade. The thrift and welfare of the people depend upon it.' *Anderson* v. *Jett*, (Ky.) 12 S. W. Rep. 670. 'It is against the general policy of the law to destroy or interfere with free competition, or to permit such destruction or interference.' *Stewart* v. *Transportation Co.*, 17 Minn. 372, (Gil. 348.) 'Competition is the life of trade,' and 'combinations and confederacies to enhance the price of any article of trade or commerce are injurious to the public,' and therefore illegal. *People* v. *Fisher*, 14 Wend. 19. 'Whatever destroys or even restricts competition in trade is injurious, if not fatal, to it.' *Hooker* v. *Vandewater*, 4 Denio, 349, 353. 'If the primary object of the firm was to prevent competition, it might be considered as against public policy,' and it would be 'condemned by proof that it was part of a conspiracy to control prices.' *Marsh* v. *Russell*, 66 N. Y. 292. 'The agreement was to prevent competition, and such competition it was not lawful for the parties to prevent or attempt to prevent.' *Hartford, etc., R. Co.* v. *New York, etc., R. Co.*, 3 Rob. (N. Y.) 415. 'A combination to artificially enhance prices is inimical to the interests of the public, and all contracts designed to effect such an end are contrary to public policy, and therefore illegal.' *Arnot* v. *Coal Co.*, 68 N. Y. 558. A combination to raise the price of lard is 'an unlawful plot,' and an indictable misdemeanor. *Leonard* v. *Poole*, 114 N. Y. 371, 21 N. E. Rep. 707; *Stanton* v. *Allen*, 5 Denio, 434; *Clancey*

v. *Salt Co.*, 62 Barb. 395; *Craft* v. *McConoughy*, 79 Ill. 349; *Bagging Co.* v. *Kock*, 14 La. Ann. 168; *Hilton* v. *Eckersley*, 6 El. & Bl. 47; *People* v. *Chicago Gas Co.*, (Ill. Sup.) 22 N. E. Rep. 798; *People* v. *American, etc., Co.*, (Cal.) 7 Ry. & Corp. Law J. 83; *Watson* v. *Companies*, 52 How. Pr. 348; *Murray* v. *Vanderbilt*, 39 Barb. 141; *Wright* v. *Ryder*, 36 Cal. 342; *Morgan* v. *Donovan*, 58 Ala. 242; DANIELS, J., in *People* v. *North River, etc., Co.*, (Sup.) 7 N. Y. Supp. 406. Thus, by the overwhelming, if not uniform, current of authority, the agreement under criticism is condemned as contrary to public policy, and illegal.

"Nor is the operation of the rule forbidding contracts restricting competition and enhancing price limited to trade in the necessaries of life; but, as appears from the citations above, extends equally and alike to all commodities of commerce. Neither need the agreement or combination, in order to expose it to the denunciation of the law, constitute a complete monopoly, or effect a total suppression of competition; but the language of courts and of writers is, that, if the agreement or combination tends to monopoly, or reduce or lessen competition, it is contrary to public policy, and unlawful, because operating *pro tanto* an artificial enhancement of price. Authorities *supra*. It results, therefore, that, as defendant's counterclaim demands the repayment of money received by plaintiff upon an illegal agreement, the court will not interpose for its restitution. The familiar maxims *ex pacto illicito non oritur actio*, and *in pari delicto potior est conditio possidentis*, are fatal to defendant's contention. Another vice in the agreement with which defendant's counterclaim is implicated would suffice to invalidate it. By the instrument constituting the Wire Cloth Manufacturers' Association it is provided that upon complaint made of its violation the accused member shall be condemned to forfeit his $2,000 deposit, which shall thereupon be divided in equal parts among the members who have determined his guilt and declared the forfeiture, and the answer alleges that the $500 which defendant seeks to reclaim was received by plaintiff as its share of the $2,000 deposited and forfeited by defendant. Plainly the tribunal so created and so empowered is obnoxious to the criticism of the court of appeals in *Austin* v. *Searing*, 16 N. Y. 112, where said: 'An agreement by which the members of an association undertake to confer judicial powers upon a body of men as a tribunal having authority to adjudicate upon alleged violations of the rules of the association, and to decree a forfeiture of the rights of parties adjudged to have been guilty of such violation, is void as against public policy, and the courts will not enforce such a contract, nor lend their aid to give effect to the decrees of a tribunal thus constituted.' And, if the courts will refuse to enforce such an agreement while executory, so will they decline to undo it when executed, but will leave the parties in the situation in which, by their illegal contract, they have placed themselves. *Knowlton* v. *Congress, etc., Co.*, 57 N. Y. 518; *Haynes* v. *Rudd*, 83 N. Y. 251. The agreement under consideration is even more repugnant to law than that condemned in *Austin* v. *Searing*, for it constitutes the persons who are to benefit by the forfeiture the tribunal by which it is to be decreed,—contrary to the principle of natural justice that no man shall be a judge in his own cause, (Broom, Max. 116,)—a principle so inviolable that not even an act of parliament can impugn it, (*Day* v. *Savadge*, Hob. 85, 87.) If, on the other hand, we suppose the agreement to be valid, and the tribunal that inflicted the forfeiture legal, the same result follows,—that defendant cannot reclaim money paid in conformity with its own contract and by the decree of a court of its own choosing. In any view the counterclaim is untenable, and the demurrer must be sustained."