JOHN P. STOCKTON, attorney-general of New Jersey, at the relation of John R. Miller and Frank W. Miller, informants, and JOHN R. MILLER and FRANK W. MILLER,

*v.*

THE AMERICAN TOBACCO COMPANY et al.

1. A court of equity does not possess the power to restrain a corporation, organized under the forms of law, from performing acts within its corporate power merely because some of the steps taken in organizing the company may have been irregular, or because the purpose of the incorporators may have been to establish a monopoly.

2. Under these conditions *quo warranto* is the appropriate procedure to challenge the right of the corporation to exercise its franchises.

3. A trading or manufacturing corporation, until its charter is annulled by such a proceeding at law, has the same authority as an individual trader or manufacturer to sell or consign its goods, to select its selling agents and to impose conditions as to whom they shall sell and the terms upon which they shall sell.

4. A decree restraining the officers and agents of a corporation from executing corporate acts is the same as a decree enjoining the corporation itself.

This suit is brought for the purpose of restraining the defendants from transacting their business, and from conducting it in a manner prejudicial to the complainants and injurious to the people of the State of New Jersey.

The bill sets out that for many years prior to January 21st, 1890, William S. Kimball and James T. Hart, under the firm name of W. S. Kimball & Company, of Rochester, New York; Charles G. Emery, under the firm name of Goodwin & Company, of the State of New York; Allen & Ginter, a corporation of the State of Virginia; W. Duke's Sons & Company, a corporation of the State of North Carolina, and the Kinney Tobacco Company, a corporation of the State of New York, had been, independently of each other, engaged in the business of manufacturing and selling paper cigarettes, and had competed with each other in the sale of their products in all of the United States; that they sold ninety-five per cent. of all the paper cigarettes manufactured and sold in the United States; that these firms and corporations, to destroy competition and crush out opposition and maintain prices, entered into an agreement on October 17th, 1889. By the terms of this agreement the parties were to be incorporated under the name of the American Tobacco Company, the capital stock to be $25,000,000, eighty per cent. of which was to be divided in fixed proportions between the parties in payment for the good will, plants, trade-marks, machinery, leases, patents, patent rights and office fixtures and all other property of a personal nature. The remaining twenty per cent., to the necessary extent, was to be issued to the parties in payment for the real estate owned by them, at a value to be appraised, and also in payment of live assets, embracing stock on hand, manufactured and unmanufactured, cash on hand, bills receivable and book accounts, and all dues to the parties. Any residue of said twenty per cent. not required for these purposes was to be divided between the parties in the same proportion as the eighty per cent. It provided for the leasing of any of the real estate agreed to be transferred, in case there was any law to prevent a conveyance thereof. It provided that the articles of incorporation or the by-laws thereof should be amended by a

vote of seventy-five per cent. of the entire capital stock, and directors should be elected by the same vote; that the directors or trustees might assign one of their own number to the management of any one of the properties agreed to be transferred.

It was further agreed that no one of the officers, without the unanimous consent of the board of directors, should engage, directly or indirectly, in any business similar to that in which the company was to be engaged, but should at all times use his best endeavors to promote the welfare and interests of the company; also that the provisions of the agreement should be carried out under the direction of certain counsel.

It is then charged that, pursuant to said agreement, William S. Kimball & Company formed themselves into a corporation in New York, under the name of W. S. Kimball & Company; that Goodwin & Company incorporated themselves under the laws of some other state, under the name of Goodwin & Company; that the parties to these agreements caused to be prepared and executed a certificate of organization of the American Tobacco Company. The certificate certified that certain persons associated themselves into a company under an act of the State of New Jersey, entitled "An act concerning corporations," approved April 7th, 1875, the business to be conducted in Newark, New Jersey, with a principal office in New York city. The objects are to cure leaf tobacco in all its forms and to establish factories, agencies and depots for the sale and distribution thereof, and to transport or to cause the same to be transported as an article of commerce, and to do all things incidental to the business of trading and manufacturing aforesaid; that the portion of the business which is to be carried on within said state is to cure leaf tobacco and to buy, manufacture and sell tobacco in all its forms; to establish factories, agencies and depots for the sale and distribution thereof, and to transport the same as an article of commerce, and to do all other things incidental to the business of the company, which must necessarily be transacted within the state; that the company proposes to carry on its operations in all the other states and territories of the United States, in Canada and Great Britain and in all foreign countries. The

total amount of capital stock is $25,000,000, to be divided into four hundred thousand shares, of which $15,000,000, divided into three hundred thousand shares of $50 each, shall be common stock, and $10,000,000, divided into one hundred thousand shares of $100 each, shall be preferred stock, eight per cent. to be paid upon the preferred stock before any dividends shall be paid upon the common stock, dividends not to be accumulative, but payable out of the profit of each year. The certificate sets out the names and numbers of shares held by the stockholders, provides that the directors shall be classified in respect to the time for which they shall hold office, and fixes January 21st, 1890, as the period at which the company shall commence, and January 20th, 1940, as the time when the company shall terminate. The certificate was recorded in the clerk's office of Essex county and filed in the office of the secretary of state.

The bill charges that the incorporators never intended to establish any factories or depots, nor have they or the company established any in this state; that they have no office or place of business in this state, and that the only business that the company has done here is to make sales and consignments of their goods to jobbers and dealers in paper cigarettes, citizens doing business here, from the incorporators' office in New York, and from their warehouses established at other points outside of this state, they having, before such attempted corporation, competed with each other in selling their goods to many of the same jobbers and dealers; that the attempted incorporation was in fraud of the laws of this state.

The bill further charges that the issue of stock was in violation of the Corporation act for the reasons above stated, and also because the eighty per cent. of the stock was issued for the purchase of property at a price fixed by the parties to the preliminary agreement was not limited to the true and actual value of the property for which it was issued; because the twenty per cent. of the stock was not equal in value to the amount of stock issued; because none of the stock was issued for money, and that it was not lawful to organize a corporation on the basis that the whole stock was to be issued for property purchased.

The bill sets out that deeds were made which purported to convey to the American Tobacco Company the real estate and personal property, and charges that they were void because the Corporation act does not authorize the association of individuals into a company for the purpose of carrying on a business which is not intended to be prosecuted wholly or partly in this state, nor does it authorize persons or incorporations engaged in business in other states to merge their respective properties into a combination designed only to enable them under the form of law to create a monopoly and crush out competition.

The bill charges that the property so conveyed was, after the execution of the conveyance to the American Tobacco Company, used in the same localities by substantially the same persons, firms or corporations as before, and that no part of the property has been removed to New Jersey.

The bill then charges that the incorporators of the American Tobacco Company, after said transfers were made, have directed its operations from a central office in New York city, and have acquired, by purchase and compulsion or otherwise, the property and interests of nearly every person and company engaged in the production of paper cigarettes, and now produces about ninety-five per cent. of said entire production.

The bill then sets out in detail the method by which the cigarettes are to be put upon the market, for the purpose of exhibiting the device by means of which it is alleged the American Tobacco Company has monopolized the trade and destroyed competition.

It states that it has been the custom for manufacturers to sell to jobbers, who sold to the retail dealers; that previous to the organization of the American Tobacco Company jobbers bought from the various manufacturers, the prices being regulated by competition; that the complainants, the Millers, are jobbers who so bought goods of the manufacturers unconditionally; that the American Tobacco Company has refused to furnish them goods, except under the terms of a paper issued by the American Tobacco Company, of all material parts of which the following is a transcript:

Attorney-General *v.* American Tobacco Co.

"THE AMERICAN TOBACCO COMPANY,
"No. 45 BROADWAY,
"P. O. Box 2591.                    NEW YORK, March 1st, 1892.

"We will be glad to consign to you, for sale on commission, cigarettes of the various brands manufactured by us, such cigarettes to be sent by us, and received, sold and accounted for by you, upon the terms hereinafter stated:

"*First.* The selling prices are at all times to be such as we may fix in our selling list sent you, and no sales shall be made by you at lower prices than those so fixed.

"*Second.* You are to guarantee all sales made by you. An extra commission of two per cent. will be allowed and can be deducted by you on all consignments remitted for us within ten days after the date of shipment to you.

"*Third.* All cigarettes consigned to you are to remain our property until sold by you, subject to your lien thereon for all advances.

"*Fourth.* The cost of freight from our factories is to be paid by us or allowed to you by us on account.

"*Fifth.* You are to guarantee us against loss by any cigarettes consigned to you, by fire or any other cause, and agree to return to us the cigarettes in good condition or their selling price as above stated. You are also to pay all charges and other expenses of every nature connected with the storing, keeping and selling the cigarettes after delivery thereof to the common carrier, including all state, county and municipal taxes and license fees.

"*Sixth.* Your commissions for selling and for all expenses made or incurred by you in connection with the business will be thirty-five cents per thousand cigarettes on all cigarettes sold at not less than two dollars and fifty cents per thousand, provided you shall fully comply with all the conditions herein contained, and shall co-operate with the company and promote its interests, and handle its cigarettes to its satisfaction. It is our intention not to consign any cigarettes for sale at less than two dollars and fifty cents per thousand.

"*Seventh.* Settlements and payments of commissions are, for convenience, to be made as follows:

"Thirty-five cents per thousand on July 1st, 1892, or as soon thereafter as practicable, on all cigarettes consigned you from the date of your signing this contract to April 1st, 1892, which have been sold by you and paid for prior to July 1st, 1892.

"Thirty-five cents per thousand on October 1st, 1892, or as soon thereafter as practicable, on all cigarettes consigned to you during the three months ending July 1st, 1892, which have been sold by you and paid for prior to October 1st, 1892.

"Thirty-five cents per thousand on January 1st, 1893, or as soon thereafter as practicable, on all cigarettes consigned to you during the three months ending October 1st, 1892, which have been sold by you and paid for prior to January 1st, 1893.

"Thirty-five cents per thousand on April 1st, 1893, or as soon thereafter as practicable, on all cigarettes consigned to you during the three months ending January 1st, 1893, which have been sold by you and paid for prior to April 1st, 1893.

Attorney-General *v.* American Tobacco Co.

"And so on from quarter to quarter thereafter in the same manner for the subsequent consignments, sales and payments.

"*Eighth.* If at any time we shall be informed and believe that you have, directly or indirectly, made any sale of our cigarettes at prices lower than those fixed by us, or have not complied with the conditions of paragraph sixth or the other provisions of this agreement, we shall have the right, at our option, to determine and declare that you have surrendered to us all right to be paid or to claim any commission not previously actually paid over to you, and if we exercise such right or option you will not be entitled to claim or receive any commissions on any part or future sales.

"*Ninth.* The right is reserved to us at any time to decline to consign to you any more cigarettes, and to withdraw the cigarettes already consigned to you after repaying to you all your advances thereon, and the right is reserved to you at any time to decline to act further for us after having accounted for the cigarettes already in your hands.

"*Tenth.* The amount of cigarettes which we shall at any time consign to you is, of course, to be determined by us before or after receiving requests or reports from you, and we shall expect such reports and account sales whenever called for.

"Consignments will be made from our several factories and depots, and advances and returns of sales must be made with New York exchange to the factory or depot from which the cigarettes were received, but all commissions will be settled and paid from this office.

"Your signature to this paper will be considered as an agreement by you to act for us on the terms and conditions hereinbefore stated.

"Should you not care to avail yourself of the above terms and act as our consignee, we shall be glad to sell you our cigarettes at list price net, without discount, commission or allowance whatever, except allowance on prepayment of freight.

"No one has any authority whatever to change any agreement, circular, letter or price list of this company."

The bill charges that while the pretended object of the agreement is to procure a disposition of the goods satisfactory to the consignor, its real object is to restrain jobbers and others from selling any paper cigarettes except those manufactured by the combination; that if jobbers undertook to sell any other paper cigarettes, the combination, in some cases, summarily withdraws its goods, and in other cases threatens to do so, and if jobbers disregard such threats, the goods are withdrawn and the combination refuses to consign any other goods on commission or even to sell, and that, inasmuch as much the larger part of paper cigarettes manufactured and sold are produced by the combina-

tion, the withdrawal of its goods is a great injury to jobbers and will result in the destruction of their business.

The bill further charges that in June, 1892, the National Cigarette and Tobacco Company was incorporated to make paper cigarettes, and has established factories and has created a large demand for its cigarettes; that the complainants began, about the 26th of January, 1893, to make purchases thereof from the maker with the view of selling them to retail dealers, as was the case with other jobbers; and had such jobbers been permitted to sell and dispose of these cigarettes, their earnings would have been largely increased. Since said combination, if the jobbers were purchasing these cigarettes, the American Tobacco Company threatened them with the total stoppage of their consignments and with the refusal to deal with them in any manner, and compelled the jobbers to refuse to receive any more cigarettes of the National Cigarette and Tobacco Company; that less than a month after the Millers had commenced to purchase the Admiral cigarettes, the American Tobacco Company discontinued to make consignments to them, and refused to deal with them further; that the American Tobacco Company has pursued a similar course in the case of many other jobbers in the United States.

The bill then charges that these are steps taken in execution of the unlawful purpose to prevent competition in the articles of commerce and in furtherance of the original design of the corporations and incorporators in forming the American Tobacco Company; that the agreement gave to the transactions the form of a consignment, while they were in fact sales, and the method was a device to enable them to carry out their scheme to secure a monopoly of the trade in cigarettes and in crushing out the National Cigarette and Tobacco Company or any rival who may endeavor to put cigarettes on the market in competition with the said corporation.

The prayer of the information and bill is that it may be decreed that the American Tobacco Company was organized, or attempted so to be, for an unlawful purpose and in an unlawful manner, and that it has no legal power or authority to use its corporate franchise for the purpose of destroying competition in

the business of the manufacture and sale of cigarettes, or for the purpose of taking in its hands or carrying on in its name the business of the firms and corporations mentioned in paragraphs 1, 2 and 3 of the bill, or for the purpose of injuring and destroying the business of the National Cigarette and Tobacco Company, or of complainants, or any jobbers and dealers who may determine to become customers or dealers with the National Cigarette and Tobacco Company, and that the defendants may be restrained from using the corporate organization of the American Tobacco Company in the conduct of their business of making and selling paper cigarettes, and from carrying on any portion of their business in the name of or by the instrumentality of the said American Tobacco Company, or from refusing to sell to complainants the cigarettes manufactured by said combination while using the name and franchise of the American Tobacco Company, and from using the corporate franchise of the American Tobacco Company to stifle competition in the business of manufacturing paper cigarettes, or to injure and destroy the business of the National Cigarette and Tobacco Company, or of complainants, or other jobbers or dealers who may desire to become customers or dealers with the National Cigarette and Tobacco Company, and for further relief.

*Mr. Thomas N. McCarter, Jr., Mr. Felix H. Levy, Mr. Thomas N. McCarter* and *Mr. B. F. Einstein* (of New York), for the complainants.

*Mr. Richard V. Lindabury,* and *Mr. W. W. Fuller* and *Mr. Joseph H. Choate* (of New York), for the defendants.

REED, V. C.

The bill is filed for a double purpose. The attorney-general, as the representative of the people of the state, asks for an injunction restraining the defendants from doing that which it is alleged amounts to a public injury ; and the relators ask for an injunction restraining the defendants from doing that which they allege inflicts upon them a special injury.

It is entirely settled that the bill may be maintained in both its aspects, or that it be maintained at the instance of the attorney-general and dismissed as to the relators. *Attorney-General* v. *Cockermouth Local Board, L. R. 18 Eq. 172 ; Attorney-General* v. *Vivian, 1 Russ. 228 ; Attorney-General* v. *East India Co., 11 Sim. 380.*

The questions propounded in the cause I will first consider in connection with the bill as one filed by the attorney-general.

The charge of the bill is that the corporation, or the incorporators of the American Tobacco Company, are conducting the business of manufacturing and selling tobacco cigarettes in a manner which destroys competition in that business and tends to create a monopoly; that this conduct is inimical to public policy, and therefore a court of equity, at the instance of the representatives of the public, will intervene to prevent any injury to the public springing out of such illegal conduct. The specific acts charged against the defendants may be ranged into two classes.

Those within the first class attack the method by which, and the purpose for which, the incorporators organized the defending corporation.

Those within the second class, as it is charged, exhibit an illegal exercise of corporate power by the American Tobacco Company since its organization.

Those acts within the first class which attack the manner in which the corporation has been organized are, first, that neither money nor property was turned over to the corporation by its shareholders in payment of their capital stock, in the manner required by the Corporation act, and second, that there was no intention in the minds of the incorporators to transact any of their corporate business or to have an office within the limits of this state. Those other acts within the first class, which are exhibited for the purpose of displaying an illegal purpose in creating the corporation, consist of the antecedent steps taken by the three corporations and two firms, they being then the leading competitors in the business of tobacco cigarette manufacturing, by which they agreed to coalesce their property interests so as to

control the trade, fix prices and paralyze competition by assuming a single corporate shape, over to which should be turned all the aggregation of property and good will, so that it would be thereafter controlled by one corporation.

I will, in the first place, consider those proved acts which it is alleged display an illegal exercise of corporate power. The corporation has adopted a scheme, which is properly designated the consignment plan, for the disposition of that part of the output of its manufactories which consists of paper cigarettes. Of the whole body of jobbers in these goods it has selected certain dealers to whom it has tendered a contract for their subscription. This contract, when signed by such jobbers, by its sixth section, obliges such jobbers, in consideration of their receiving from the American Tobacco Company a commission of thirty-five cents for each one thousand cigarettes sold, to sell them at a price of not less than $2.50 a thousand, and to co-operate with the American Tobacco Company to promote its interests and to handle its cigarettes to its satisfaction. The penalty of a failure on the part of the jobber to perform his part of the·contract is designated in the eighth section of the consignment contract. The provisions of this section, already set out, are that if the company, at any time, shall be informed or believe that the jobber has directly or indirectly made any sale at prices lower than those fixed, or shall not have complied .with the conditions of paragraph 6 or the other provisions of the agreement, the company shall have the right, at its option, to determine and declare that the jobber has surrendered all right to be paid or claim any commissions not previously actually paid.

The substance of the plan, as is perceived, is this: The company will put its goods into the hands of those jobbers who sign the agreement to maintain the prices fixed, and to handle the goods to the satisfaction of the company, and will pay to such jobbers the prescribed commission. To such jobbers as do not promise to perform the provisions by signing the consignment agreement, no commissions are allowed.

Now, it is charged that the American Tobacco Company has, by its conduct, so construed the sixth section of the agreement

that whenever a jobber has bought and sold paper cigarettes manufactured by others than the American Tobacco Company, he has been cut off from the benefit of the consignment agreement, on the ground that he had not handled the cigarettes of the American Tobacco Company to its satisfaction. It is charged that the brands of cigarettes manufactured by the American Tobacco Company are so well and favorably known in the trade that no jobber can afford to forego the advantage of the commission to be derived from the sale of cigarettes manufactured by that company; that he is thus precluded from dealing in the cigarettes made by other manufacturers, and is deprived of the profit which he could derive from the sale of other cigarettes if he were permitted to sell them as well as those of the American Tobacco Company. Besides this complaint of injustice to the jobbers, there is the complaint that other manufacturers are, by this scheme, prevented from getting a footing in the market, because jobbers who deal in the brands manufactured by the American Tobacco Company will not handle the goods of other manufacturers. This is the complaint of the National Cigarette Company the most, indeed the only, formidable competitor of the American Tobacco Company.

Now, suppose it be assumed that all these charges are proved; assume that it appears in the testimony that the American Tobacco Company has so enforced its consignment agreement as to make it practically impossible for any jobber to handle its goods, and at the same time to deal in goods made by others, and assume that from such conduct the alleged consequences flow, the query remains, what power has this court to interfere at the instance of either the attorney-general or of any jobber?

If the conduct now the subject of complaint had been that of an individual manufacturer instead of a corporation, I do not imagine that any lawyer would think of pressing before any court the proposition that such conduct could be enjoined. An individual manufacturer can sell his manufactured stock to whom he pleases, on any terms he pleases, and can refuse to sell to anyone with whom, for his own reasons, however capricious, he does not care to deal. He can select his agents to sell his goods,

and fix any rate of commissions.   He can accompany his con-
signment to such agent, with such restrictions as to the price or
the terms of sale, or in respect to the parties to whom he may
sell, as he pleases.   Within these limits the power of an owner
of manufactured goods is absolute.   No court would possess a
semblance of authority to annul or enjoin, at the instance of any
third party, any arrangement between such an owner and his
agent; similar to that existing between the American Tobacco
Company and its jobbers.

Now, conceding for the present that the American Tobacco
Company is a legally-existing corporation, with the power to
manufacture and sell paper cigarettes, in what respect does its
power to deal with its manufactured goods differ from the power
of an individual manufacturer to deal with similar goods, or in
what respect does the power of a court of equity to control the
business of such corporation differ from its authority to superin-
tend the business of an individual?   The fact that a corporation
is an entity, representing an aggregation of skill and capital,
does not curtail its right to transact the business which the
state's charter empowers it to conduct with exactly the same
freedom as a citizen.   So long as by the policy of this state the
formation of corporations is permitted, so long will the right of
such artificial persons to act within the scope of their franchises
be in no sense different from the right of an individual.   The
control of a court of equity over the business conduct of either
is exactly the same.   The contracts of either will be rectified,
annulled or specifically enforced, and the duties of either as
trustee or its right as *cestui que trust* will be enforced and pro-
tected.   Any illegal conduct of either leading to irreparable
injury will be enjoined.   A nuisance created by either will be
restrained.   Indeed, whenever either an individual or corporation
becomes related to any other individual or corporation, so that
equitable jurisdiction arises to remedy some wrong or secure
some right, it matters not whether both parties are individuals
or both corporations, or that one is a natural and the other an
artificial person.   The cases cited upon the argument, wherein a
court of equity has enjoined the acts of a corporation, will be

found to be cases where *quasi*-public corporations have acted outside of the scope of their charter privileges, or have violated an implied limitation upon its general power, so as to create a nuisance or a public injury. I now exclude those cases where a corporation has combined with some other corporation or corporations, or person or persons, to create a monopoly. I will allude to those cases hereafter. I am now speaking of the cases in which the acts of a single corporation, in respect to their effect upon public, private and civil property rights, have been judicially considered. The following are cases where the acts of a *quasi*-public corporation were restrained because they were not within the powers conferred upon it and were presumed to be inimical to the public weal.

In *Attorney-General* v. *Great Northern Railroad Co., 1 Drew. & S. 154,* upon an information filed by the attorney-general, the railway company was restrained from dealing in coal because it had not been authorized by parliament to conduct this business.

In *Attorney-General* v. *Great Eastern Railroad Co., 11 Ch. Div. 450,* upon an information filed by the attorney-general on the relation of a dealer in locomotives, the company was restrained from letting and hiring engines and rolling stock. The restraint was put upon the ground that the act of parliament did not authorize it, and it therefore was contrary to the public weal.

Then there are a numerous class of cases where such *ultra vires* acts of corporations threatened a public nuisance. Among these is that of *Attorney-General* v. *Middle Kent Railway Co. et al., 3 Ch. App. Cas. 100,* where a bill was filed to compel the defendants to carry a public road over defendants' railway at the proper statutory slope; the obvious ground was that any other slope would interfere with the public use of the road.

In *Attorney-General* v. *Cockermouth Local Board, supra,* a similar bill was filed to restrain the defendants from discharging sewage into a river from which the town received its water for domestic use.

*Mayor &c. of Georgetown* v. *Alexandria Canal Co. et al., 12 Pet. 91,* was a suit to restrain the defendant from constructing

an aqueduct across the Potomac, a public highway, and so creating a public nuisance.

In *Penn* v. *Wheeling and Belmont Bridge Co. et al., 13 How. 518,* defendants had injured the state's line of railroads and canal by building a bridge at Wheeling, and so caused a public nuisance.

*District Attorney* v. *Lynn and Boston Railroad Co., 16 Gray 242,* was a suit to prevent defendants from laying a track within the limits of the town of Saugus.

*People* v. *Vanderbilt, 26 N. Y. 287,* was a bill to prevent defendants from erecting a pier in the North river. It was upon the ground of restraining a public nuisance that the injunction was sustained.

In the case of *Raritan and Delaware Bay Railroad Co.* v. *Delaware and Raritan Canal and Camden and Amboy Railroad and Transportation Co., 3 C. E. Gr. 547,* "the road established by the defendants in excess of their legitimate power is a public nuisance and an usurpation of the rights of sovereignty in the body politic" was the language in the opinion of the court of errors, and as the complainants were specially injured by the establishment of the competing line through the exercise of the usurped powers, it had the right to invoke the aid of a court of equity.

The case of *Attorney-General* v. *Delaware and Bound Brook Railroad Co., 12 C. E. Gr. 631,* involved the question whether the erection of a bridge across the Delaware created a public nuisance and caused injury to public property.

These cases and others cited in the brief of counsel, as is perceived, were instances of public nuisances or public injuries; they were threatened acts interfering with roads, streets, highways, state property or acts likely to foul public waters. It may be regarded as settled that where a *quasi*-public corporation exceeds its corporate powers, and its acts involve a nuisance or otherwise tend to a public injury, a bill may be exhibited against such corporation in the court of chancery.

But it is perfectly obvious in this case that, upon the assumption that the American Tobacco Company is a legally-organized

corporation, there is not the least ground for imputing to their conduct since their organization an *ultra vires* character, for, as already observed, it has by force of its corporate existence under the general Corporation act the power to manufacture and sell its goods, and it became thus invested with the same control over its business as if it had been an individual. Measured by this standard, it was acting within the limits of its legal right when it adopted its method of putting or refusing to put its cigarettes into the hands of the dealers in those goods. Indeed, if the corporation is to be treated as a single entity, it is admitted by the counsel for the complainants that the language of Mr. Justice Russell, in the case of *John D. Park & Sons Company* v. *Wholesale Druggists' Association* (still unreported), correctly states the law. The judge remarked: "It is lawful for each manufacturer to refuse to sell to any customer, for any reason however capricious, any goods manufactured by him."

But the contention of the counsel for complainants is that while this may be true, yet a combination of manufacturers having control of a given trade cannot refuse to sell to any customer on the ground that he deals also with a competitor, or because he sells at a price lower than that fixed by the combination. Now, it may be conceded that if this corporation had entered into an agreement with other manufacturers of these goods, whether those manufacturers were individuals or corporations, by which agreement prices were to be fixed and competition paralyzed, such an arrangement would be a subject of equitable cognizance. Such was the case of *Stockton, Attorney-General,* v. *Central Railroad Co. and Philadelphia and Reading Railroad Co., 5 Dick. Ch. Rep. 52.*

In that case the defending corporations had entered into a contract to lease the Central railroad to what was substantially the Philadelphia and Reading railroad. The lease was declared not only to be *ultra vires*, but to be made for the purpose of creating a monopoly in coal. The right of either of these companies to regulate its own business, whether it involved the fixing of the price for which coal should be sold or to whom it should be sold, was not involved, nor were the corporate powers

of the company curtailed. What was done by the court of chancery was to annul a contract made by one company with another corporation, entirely aside from its corporate power and executed for an illegal purpose. Viewing the American Tobacco Company as a corporation legally organized under the laws of this state, with the power to manufacture and dispose of paper cigarettes, it has not exceeded the limits of its corporate rights, and therefore has not been guilty of acts akin to a nuisance, either public or private. This result seems to be the logical conclusion from the promise that so long as a person or corporation acts within its legal right, it cannot be guilty of a legal wrong.

It follows from this that the power of this court to deal with the defendants, if it exists at all, must rest upon the conduct of the incorporators preceding and leading up to the incorporation of the company, or must rest upon the power of this court to regard the acts of the incorporators, after the company came into existence, as distinct from the acts of the corporation itself.

The attack upon the acts of the incorporators preceding the organization of the company is, as I have already observed, made upon the several grounds that the capital required by the Corporation act was not paid in, and that there was no purpose to have any of the corporate business transacted in this state nor to have an office here, and that the purpose of the corporate organization was to erect a monopoly, of which purpose the consignment plan and the method of its enforcement are the sequences.

The first question which concerns us is whether these attacks upon the manner of creating the company do not directly challenge the existence of the corporation itself, for if this be so, it is entirely settled in this state that a court of equity has no jurisdiction to consider the matter at all. From the time of the decision of Chancellor Vroom, in *Attorney-General* v. *Stevens et al., Sax. 369*, where he held that the existence of a corporation could not be questioned in a suit in equity, on the ground that the stock had not been subscribed according to law, the rule then laid down in that case has been followed as the law of this state. It was so recognized by the court of appeals in *National*

*Docks Railway Co.* v. *Central Railroad Co., 5 Stew. Eq. 755,* and *Elizabeth Gaslight Co.* v. *Green et al., 1 Dick. Ch. Rep. 118.*

Now, conceding that the capital stock of the American Tobacco Company was not properly paid in, or admitting that any other step in the process of its organization was defective, yet, in the words of Chancellor Vroom : " Here is a set of men claiming to be a legally-incorporated company under the act of the legislature, exercising all the powers and functions of a corporation.  They are a corporation *de facto,* if not *de jure.* Everything necessary to constitute them a corporation has been done colorably, at least, if not legally.  I do not feel at liberty, in this incidental way, to declare all their proceedings void, and treat them as a body having no right or powers.   *   *   * The corporation is now organized, and if acting without authority is liable to be brought at any time before a competent tribunal in a mode, the legality of which cannot, as I apprehend, be questioned."

Nor does the corporate existence of this company seem to be amenable to equitable cognizance because the purpose of its organization may have been unlawful.

In *National Docks Railway Co.* v. *Central Railroad Co., supra,* the suit was to restrain the National Docks and its incorporators from erecting a railroad on the ground that the corporation was the mere agent of the National Storage Company, and that that road was designed to be only a means of providing the storage company with transportation for its merchandise, and that this was for a private and not a public purpose.   In delivering the opinion of the court of errors and appeals, Mr. Justice Dixon said : " These reasons, if they have any force, go directly to the legality of the organization of the railway company.   If they should prevent the exercise by the company of the powers which the General Railroad law confers upon corporations created under it, it is because the company should not have been created in the mode and for the purposes in and for which it has been organized, and should be disbanded.   It is not denied that every formal requirement of that law has been complied with, and that, to all external appearance, this company is a corpora-

24

tion by virtue of its provisions, but it is claimed that the motives and purposes of its corporators being what they are, they have usurped a corporate existence which the law did not authorize them to assume, and hence, while they may retain the form, they cannot excercise the functions of a corporation. Not because this corporation threatens to assail any rights of the complainants which, if lawfully organized, it would not be permitted to invade, but because it is a corporation de facto merely, and not de jure, does the chancellor prevent it from doing what only a legal corporation may do."

In that case, it is perceived, the court held that although the National Docks Railway Company may have been organized with the object of accomplishing an end subversive of the purpose of the General Railway act, yet a court of equity would not enjoin the exercise of a power it possessed as a corporation having a de facto existence under the law of the state.

Now, in the case at bar, it is charged that the purpose of the five concerns, the owners of which projected a scheme of incorporation, was to coalesce their separate competing businesses into one organization, for the purpose of destroying competition and controlling the trade in cigarettes.

Whether the contracts preceding the act of incorporation by which these concerns agreed to capitalize their five businesses at $25,000,000, each to put in its good will, plant, trade-marks, machinery, leases, patents, patent rights and property, and the stock to be distributed in the manner fixed by the agreement was inimical to public.policy, I shall not stop to consider. If so, the agreement or agreements would have been unenforceable in any court, and it may be that upon a bill filed by the attorney-general such contract would have been annulled. But that contract has been executed. As a contract it has ceased to have any efficacy whatever. All that can be said of it in this case is that its provisions exhibit the purposes for which the corporation was organized, and the sole question here is whether, if such purpose appears to have been to establish a monopoly through the instrumentality of this corporate organization, this court can, upon that ground, restrain any act done by the corpo-

ration itself within its corporate power. Now, that such an exertion of power by a court of equity would strike at the authority of the corporation to act at all as a corporation, is perfectly clear. The corporation must be either a legal or illegal entity. If legal, then, as I have already observed, it possesses the right to dispose of its goods in its adopted manner. If illegal, it has no right to transact any business at all as a corporation. An injunction which would, in the language of the prayer of the bill, restrain the company from using the corporate organization in the conduct of their business of making and selling paper cigarettes, and from carrying out any portion of their business in the name of the American Tobacco Company, "would be as efficient an annulment of their franchise as would be a judgment against them upon *quo warranto.*"

Nor does the alternative decree proposed upon the argument elude this difficulty. The proposed injunction would restrain the company

"from selling, consigning or otherwise disposing of any cigarettes manufactured or owned by it to any person or persons, by any arrangement, contract or device, by which such purchaser or consignee shall be restricted or controlled in the price for which he may sell such goods, or which shall hinder or prevent such purchaser or consignee from dealing in or selling the goods of other manufacturers or dealers."

It is apparent that such an injunction must rest upon proof that the company has no legal right to adopt the method enjoined. Regarding the corporation as a legal entity, it has such legal right. The company in thus acting is, as has been observed, moving in the lines of the powers conferred upon it by the certificate of incorporation. An order, therefore, which strips it of the power to exercise its franchise in this particular is, *pro tanto,* an annulment of its charter.

Nor, in my judgment, is this result evaded by enjoining the officers individually instead of restraining the corporation. It is perfectly obvious that what has been done since the organization, and what is intended to be done in the future, are corporate and not individual acts. The power of the corporation to select its officers and agents in the manner prescribed by the Corpora-

tion act or permitted by law is plenary. Now, it seems a paradox to say that a corporation can do, through its agents, what the agents cannot do. Inasmuch as corporate existence can only be manifested through its officers, and corporate privileges can only be utilized by means of agents, it is impossible to detach the corporation from those who represent it and deny to the latter what is conceded to the former. An injunction which ties the hands of the officers and agents of a corporation from transacting any corporate business is the exact equivalent of an injunction which prevents the corporation from transacting any business, which, as already remarked, is the equivalent of a judgment on *quo warranto.*

It will be perceived that in *National Docks Railway Co.* v. *Central Railroad Co., supra,* the prayer, in part, was to restrain the incorporators of the National Docks Railway Company, but the idea of regarding the acts of the incorporators as distinct from the incorporation was not even noticed in the decision of the cause.

Counsel for the complainants, in answer to the objection taken that this court was without jurisdiction in this case to question the *de facto* existence of the American Tobacco Company, insist that the attack here made is not a direct but a collateral attack, and that the rule is that a court of equity can determine a question of corporate existence whenever it becomes necessary to determine some other matter of equitable cognizance. The cases cited in support of this view are *Johnston et al.* v. *Jones, 8 C. E. Gr. 216; Mechanics' National Bank of Newark* v. *Burnett Manufacturing Co., 5 Stew. Eq. 236; Kean* v. *Union Water Co., 7 Dick. Ch. Rep. 813.* Neither of these cases involved the existence of a corporation. They all concerned the legality of the election of the officers of a *de facto* corporation. In these cases the doctrine is announced that no officer of a corporation can be ousted from his office except by a direct proceeding at law to try his title, and an exception to that doctrine is stated to be that if some other ground for equitable jurisdiction arises, as where the office is obtained by fraud, by breach of trust, by concealment or treachery, then a court of equity will

restrain the acts of such officer. When persons pretend to act for a corporation, then, in a suit to enjoin an act of such pretended officers which threatens irreparable injury, a court of equity will intervene and decide the question of agency. *Johnson* v. *Jones, supra.* So when the question involves the agency of officers of a corporation to bind the corporation by a contract enforceable in equity, the court will decide the question of power to make the contract. *Doremus* v. *Dutch Reformed Church, 2 Gr. Ch. 332.* So when it became necessary to decide who were the officers of a corporation entitled to file an answer for it, on objection taken to the answer by complainant, a stranger, the question of agency was necessarily determined by the court, the court, however, refusing to examine the legality of the election of the officers who had filed the answer, they being clearly *de facto* officers.

On the other hand, as in *Owen* v. *Whitaker, 5 C. E. Gr. 122,* and *Kean* v. *Union Water Co., supra,* where no matter of equitable cognizance was involved, the court refused to decide the legality of the election of one or the other of two competing boards of directors.

It is perceived that neither of these cases involved the question whether, if the acts of the corporation presented a matter of equitable cognizance, a court of equity would determine whether a corporation having a colorable existence was a legal corporation. They were cases where certain acts were done by persons who pretended to represent existing corporations. The question was not whether there was a legal corporation, but whether the officers pretending to act for it were really officers and agents of the corporation.

In *National Docks Railway Co.* v. *Central Railroad Co., supra,* as already remarked, the bill was filed to restrain the former company from constructing its road across the land and tracks of the latter company and from condemning and taking such land. The injury threatened was one which courts of equity have time and time again enjoined when the illegality of the proposed acts was apparent. Therefore, upon the theory propounded by the brief of counsel, these facts would present a

ground for equitable interference, and so would confer upon a court of equity a right to inquire incidentally concerning the legality of the existence of the corporation which, by force alone of its corporate franchise, could claim the power to build its road across the land of the Central Railroad Company.

So, in *Elizabeth Gaslight Co.* v. *Green, 1 Dick. Ch. Rep. 118; S. C., 4 Dick. Ch. Rep. 329*, the complainant was injured in a manner which admittedly entitled it to an injunction against the defendant, if the latter had exceeded its corporate power; but it having acted within the powers conferred upon it, the court would not permit the legality of the corporation existing under the forms of law to be impugned.

Nor can I regard as tenable the suggestion that in the case of *National Docks Railway Co.* v. *Central Railroad Co., supra*, the doctrine in regard to the immunity of corporations from attack in a court of equity was limited to suits between private parties, and so contained an implication that, as to suits by the attorney-general, as the representative of the public, a different rule might be recognized.

In the opinion of the learned justice in the last-named case, the case of *Attorney-General* v. *Stevens, supra*, was cited as an apposite precedent, and attention was called to the fact that in the cited case the attorney-general was the informant, as well as to the fact that the information was to restrain the erection of a bridge over South river, in Middlesex county. In that case, it is perceived, the design of the defendants was to create what, if done without corporative authority, would be a public nuisance, and yet the question of the corporate existence of the defendants, Chancellor Vroom refused to entertain upon grounds which seem to have met the entire approval of the court of errors in *National Docks Railway Co.* v. *Central Railroad Co., supra.*

I am constrained to the conclusion, therefore, that by the law entirely settled in this state, a court of equity does not possess authority to enjoin an act done by a corporation organized under the forms of law, within the scope of the powers conferred upon it by its charter or certificate of incorporation, merely because of

defects in the method of organization of the company, or because it was organized with a design of exercising its powers illegally.

Nor have I found, in the exhaustive briefs of the learned counsel for the complainants, any satisfactory authority in the judgment of the courts of other jurisdictions in support of the equitable power now claimed by the complainants, for this court, in this action. The class of cases in which the right of the attorney-general to come into a court of equity to restrain, as *ultra vires*, acts of *quasi*-public corporations, or to restrain acts which have created or threatened to create public nuisances, have been already mentioned. Those cases, as already observed, have no pertinency to the facts of this case.

Then there is a class of cases involving actions brought for violation of contracts, suits to specifically enforce contracts, suits brought to annul contracts, where the contracts were agreements between two or more persons or two or more corporations, or between persons and corporations to fix prices, regulate the output of manufactories, create monopolies and destroy competition. Of the numerous cases of this class cited, the following are the most important: *Hooker & Woodward* v. *Vandewater*, *4 Den. 349; Central Ohio Salt Co.* v. *Guthrie*, *35 Ohio St. 666; Morris Run Coal Co.* v. *Barclay Coal Co.*, *68 Pa. St. 173; Craft* v. *McConoughy*, *79 Ill. 346; Emery* v. *Ohio Candle Co*, *47 Ohio St. 320 (May 6th, 1890); Texas and Pacific Railroad Co.* v. *Southern Pacific Railroad Co.*, *41 La. Ann. 970; Judd* v. *Harrington*, *19 N. Y. Supp. 406; Nester* v. *Continental Brewery Co.*, *161 Pa. St. 473; Chicago Gaslight Co.* v. *People's Gaslight Co.*, *121 Ill. 530.*

These cases would be pertinent if this suit had been an action for a breach of the agreement entered into for the incorporation of the American Tobacco Company, or if it were a suit to enforce such agreement, or a suit attacking an agreement entered into by this corporation with some other person or corporation to fix prices and defeat competition. But as this court, for the reasons already stated, is bound to assume the legality of the corporation, and as there has since its organization been no illegal agreement made by it to combine with any other corporation or

person to fix prices or establish a monopoly, there is no ground for equitable interference with its corporate acts.

Then there are cases in which independent parties have been held indictable for conspiracy for entering into combinations to fix prices and creating monopolies by killing competition. For reasons similar to those just mentioned, these cases are irrelevant. For admitting that the agreements for organization were not only void, but were also criminal, either at common law or under the Sherman Anti-trust act, such an assumption could not affect the existence of this corporation when attacked in a collateral proceeding. While the corporation stands as a legal body, its acts must be regarded in the light of its charter rights. So long as its acts are within the purpose of its corporation, it would be absurd to say that, at common law, its officers or its agents are indictable for conspiring to do that which the corporation as a single entity is entitled to do. Whatever may have been said by the courts of other states concerning indictments under local statutes can be of no service here, for the question in hand is whether the defendants have done something under the law of this state to inflict wrong upon a private citizen or upon the body of citizens of this state, which wrong is remediable by injunction. In regard to the attitude of this company toward the federal anti-trust statute, it cannot be pretended that, since its organization, the company has violated the provision of that statute.

The last class of cases cited upon the argument to which I shall allude are those in which the existence of corporations has been directly attacked by informations in the nature of *quo warranto*, brought to annul charters on the ground that a corporation was organized for the purpose, or was using its franchises for the purpose, of establishing a monopoly and stifling competition. The important modern cases in which these questions have arisen in this way are the following: *People* v. *North River Refining Co., 54 Hun 354; S. C., 121 N. Y. 582; People* v. *Milk Exchange, 145 N. Y. 267; State* v. *Standard Oil Co., 49 Ohio St. 137; People* v. *Chicago Gas Trust Co., 130 Ill. 268; People* v. *Distilling and Cattle Feeding Co., 156 Ill. 448; State* v. *Nebraska Distillery Co., 29 Neb. 700.*

In each of these cases, by the form of the proceeding, the corporate organization of the defendant was on trial. It was a proceeding at law brought to directly test the right of the corporation to further employ its franchises. In each of those cases the court extended its inquiry into the circumstances surrounding the inception, the growth and the consummation of the scheme for incorporation, as well as into the manner in which the corporation had used or abused its charter privileges after incorporation. These cases, it is perceived, are also entirely irrelevant to the point involved in the present suit. These were the cases employed by the counsel of complainants in laboring to establish the very important proposition that this court would look behind the American Tobacco Company and see several corporations or firms really operating behind the corporate mask; that the court would strip off disguises and regard the substance of things, and that the court would impute to the corporation the acts of the incorporators. The authorities advanced in support of the proposed line of judicial conduct consisted, with one exception, of the language used by judges in cases where the court was trying the right of corporate existence under *quo warranto* proceedings. In *quo warranto* proceedings, the power of the court to adopt this line of conduct would be entirely clear; therefore, the language of the judge used in that class of cases proved nothing respecting the power of this court in a proceeding for injunction. The exceptional case to which I have just alluded is that of *Stockton* v. *Central Railroad Co., supra,* and the language cited was that of the learned chancellor in delivering his opinion in that important case.

But the question under consideration in that case was whether the Central Railroad Company had violated the terms of the statute which forbade the execution of a lease by it to any foreign corporation except under certain unperformed conditions. The company had executed a lease in form to a domestic corporation, and the chancellor was speaking of the circumstances which disclosed to him the fact that while the lease was in this form, yet the domestic corporation was a mere agent of another corporation, and that the real undisclosed principal in the transaction

was the Philadelphia and Reading Railroad Company, a foreign corporation. Now, the propriety of disregarding the form of the lease in that case is perfectly obvious, for it is not only always competent for anyone concerned in a contract except the party agent himself to show that a party who, although appearing as a principal, is in fact an agent, with a real principal behind him, but it is always competent to show that a statute which prohibits such a transaction is being violated by an illusory arrangement. It was in respect to this point that the chancellor spoke of the power of the court to strip off disguises and look at the substance rather than the form of the transaction. The inquiry involved no attack on the corporate existence of either of the three corporations concerned in the affair. Regarding each as a distinct entity, having the contractual ability and liability of individuals, the court was quite as competent to hold that one corporation was acting as the agent for the other as it would be to hold that one individual was the agent of another. If there had been a statute prohibiting any two or more persons or corporations from combining to lease joint property to one lessee, and a question had arisen whether a lease made by the corporation was to be regarded as a lease made by two or more of the incorporators, it would have presented a proposition analogous to that involved in the present suit. In a suit in chancery to annul such a lease it seems to me but one answer could have been made, namely, that the lease having been made by a corporation organized under the forms of law, with a power to make the lease, must be regarded as an instrument of the corporation alone.

I am constrained to the conclusion that the questions discussed in this case cannot receive judicial consideration in this proceeding, and that the only method by which they can be raised and decided is by an information in the nature of a *quo warranto* instituted in a court of law. While I have in my discussion alluded to the case as exhibited by the attorney-general, it is perceived that the same defective jurisdiction which exists in respect to his bill exists also in respect to the bill of the relators. This is entirely apparent from the fact that the

only ground of equitable jurisdiction is public injury, which has specially injured the relators. If there was no public injury, so far as can be inquired of in this suit, then there was no injury to any one of the public.

I will advise a decree dismissing the bill.